## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## STATESBORO DIVISION

TRAVIS JONATHAN MITCHELL,

        Plaintiff,

     v.

VALDERINE JACKSON,

        Defendant.

CIVIL ACTION NO.: 6:17-cv-143

### ORDER AND MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This action is currently before the Court on Defendant Jackson's Motion for Summary Judgment.  Doc. 23.  Plaintiff did not oppose Defendant's Motion, despite receiving notice of the filing of this Motion and being provided with ample opportunities to respond.  See Docs. 25, 29.  Based on my review of the entire record, I **RECOMMEND** the Court **GRANT** Defendant's unopposed Motion, doc. 23, **DISMISS** Plaintiff's Complaint, and **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.  I further **RECOMMEND** the Court **DENY** Plaintiff leave to appeal *in forma pauperis*.

### BACKGROUND

Plaintiff brought this action under 42 U.S.C. § 1983 while incarcerated at Hays State Prison in Trion, Georgia, to challenge certain conditions of his confinement at Georgia State Prison in Reidsville, Georgia.  Doc. 1 at 1.  Plaintiff's Eighth Amendment claim against Defendant Jackson is the only claim currently pending before the Court.  Docs. 7, 10.

Plaintiff's claim arises from a conversation with Defendant Jackson on April 22, 2016.  Doc. 1 at 5–6; Doc. 23-1 at 2; Doc. 25-3 at 25–36.  Plaintiff and Defendant Jackson spoke in

Defendant Jackson's office, and Plaintiff told Defendant Jackson that members of the Bloods gang put a $1000 hit on him because he refused to smuggle drugs into the prison through visitation.  Doc. 1 at 5; Doc. 25-3 at 25–26, 35–38, 79–80, 95–97.  Prior to his meeting with Defendant Jackson, Plaintiff observed that other inmates were "running into the dorm trying to get to [him], trying to jump on [him] and stuff," but he successfully avoided an attack by "go[ing] to [his] cell and lock[ing] the door."  Doc. 25-3 at 27, 96.  During the meeting, Plaintiff requested to be reassigned to another dormitory.  Id. at 25.  According to Plaintiff, this conversation with Defendant Jackson lasted about 30 minutes.  Id. at 31.

In April 2016, Defendant Jackson worked as the Unit Manager at Georgia State Prison. Doc. 25-1 at 1–3.  She had "authority to recommend to the Classification Committee that" an inmate be considered "for reassigned housing and inmate an administrative process."  Doc. 25-1 at 3.  However, she lacked "the independent authority to assign or reassign inmates to particular dormitories, and [she] did not have independent authority to reassign [Plaintiff] from his assigned dormitory housing in April[] 2016."  Doc. 25-1 at 3; see Doc. 23-1 at 4.

When Plaintiff met with Defendant Jackson on April 22, 2016, he was classified as a "close security" inmate and housed by himself in cell 14 in dormitory E-1 ("E1-14") of the E-Building.[1]  Doc. 25-3 at 14–18, 20, 37, 76.  The E-Building consists of two dormitories (E-1 and E-2) which are separated by a "little day room," another room, and some televisions.  Id. at 37–39.  There are "three ranges" on each side, and there are "two external doors from E-2 to E-1"

---

[1]   Plaintiff has been incarcerated at approximately 17 different prisons during his time in the custody of the Georgia Department of Corrections.  Doc. 25-3 at 10.  He was incarcerated at Georgia State Prison (which is located in Reidsville, Georgia) from about 2009 to 2012.  Id. at 10–13.  During that time, Georgia State Prison housed Tier I inmates in the E-Building.  Id. at 18–20.  At the time of Plaintiff's attack, however, the E-Building was the "detail dorm," and Tier I inmates were housed in the G-Building.  Id. at 18–19, 30.

which open, allowing inmates to "walk through each side." Id.  An officer from the control room electronically opens and shuts these doors.  Id.; Doc. 25-1 at 2.  The cells doors in E-1 and E-2 can be locked by the inmate from the inside.  Doc. 25-3 at 14–18, 37; Doc. 25-1 at 2.  A locked cell door can only be opened by the inmate or by an officer in the control room.[2]  Doc. 25-3 at 14–18, 37; Doc. 25-1 at 2.  Before the control room officer opens a locked cell door at the request of another inmate, the officer is supposed to check the requesting inmate's identification or observe the inmate in the cell wave his hand.  Doc. 25-3 at 56–57; Doc. 23-1 at 6–7.

On April 22, 2016, Plaintiff asked Defendant Jackson to transfer him to a cell in the C-Building, which is located on the opposite side of the prison.[3]  Doc. 23-1 at 2–3; Doc. 25-1 at 2; Doc. 25-3 at 44, 85–86, 94–96.  However, after looking up Plaintiff's file on her computer, Defendant Jackson informed Plaintiff that he could not be transferred to the C-Building because of his status as a "close security inmate."[4]  Doc. 25-1 at 2; Doc. 25-3 at 35–36, 86, 44–45.  Plaintiff then asked Defendant Jackson to put him in protective custody the K-4 dormitory; however, Defendant Jackson told Plaintiff she could not send him there because K-4 was full.[5]  Doc. 1 at 5; Doc. 23-1 at 3; Doc. 25-3 at 45, 48–49, 64–65, 95.

---

[2]     At his deposition, Plaintiff testified that inmates sometimes "rig" the external doors to the E-Building by "taking knives, long pieces of metal and . . . popping the doors open."  Doc. 25-3 at 39–46.  Plaintiff stated that, unlike the external doors, the cell doors cannot be popped open in this manner.  Id.

[3]     Plaintiff testified that the C-Building is "just like E-Building" and "designed the same," but the C-Building is on the opposite side of the prison.  Doc. 25-3 at 26–27.  Inmates on one side of the prison cannot access the opposite side of the prison.  Id. at 26–27.  Though Plaintiff believes there are members of the Bloods gang on the other side of the prison, he testified that he felt he only faced danger from the particular group of Bloods located on his side of the prison.  Id.

[4]     During his deposition, Plaintiff testified he told Defendant Jackson that there were other close security inmates on the opposite side of the prison.  Doc. 25-3 at 14, 17–18, 33, 45, 62, 86.  Plaintiff also stated that the F-Building houses only "closed security inmates," and he, like other close security inmates, is assigned to cell block containing both closed and medium security inmates.  Id. at 14, 17–19.

[5]     Inmates in protective custody in the K-4 dormitory are housed in "one-man cells" without a roommate.  Doc. 25-3 at 18–19, 34.

In her affidavit, Defendant Jackson writes that during this meeting, Plaintiff "did not indicate" and she "did not understand" that Plaintiff "felt he was under a substantial risk of serious harm from other inmates, especially inmates who were housed within his dormitory and could not properly gain access to [Plaintiff's] locked cell door."  Doc. 25-1 at 3; <u>see</u> Doc. 23-1 at 4.  After meeting with Plaintiff, Defendant Jackson entered a note about the meeting into the prison database system.  Doc. 23-1 at 3; Doc. 25-1 at 3–4; Doc. 25-2; Doc. 25-3 at 118–19.  In this note, Defendant Jackson wrote:

> Saw offender Mitchell in office, he alleged that he's having problems with Blood Gang members and that he wanted to go to C-1/2.  I advised him that there's gang members in all dormitory and if he feels as though he needed to be secluded he can go back to Tier I.  He states he don't want to go to lockup because his fiancée is supposed to be coming dome from Pennsylvania and he don't want to be in lock down when she comes.  I gave him a chance to make a phone call . . . but no answer.  He went back to E-1.[6]

Doc. 25-2; Doc. 25-3 at 79–80, 118–19.

Plaintiff disputes that Defendant ever suggested placing him in Tier I.  Doc. 25-3 at 30, 34, 44, 85–86.  Plaintiff agrees he "could have" asked Defendant Jackson to place him in Tier I and that he also could have "refused housing" in order to cause the prison to send him to lockdown.  Doc. 25-3 at 48, 63–64.  However, he believes that he requested Defendant place him in lockdown when he asked Defendant to place him in K-4.  <u>Id.</u> at 10, 18–19, 48–49, 95.  Plaintiff disputes that he would have been sufficiently protected in Tier I because Tier I inmates "have a roommate," and putting him "in a two-man cell . . . couldn't have done [him] any good" because he might have been assigned to a cell "with another Blood."  <u>Id.</u> at 19, 34.

The parties agree that Plaintiff asked Defendant Jackson whether she could make sure the officers kept the external doors to E-1 closed.  Doc. 1 at 5; Doc. 25-1 at 2; Doc. 25-3 at 41, 96.

---

[6]   This statement is quoted as directly as written, and no effort has been made to correct or change the errors contained within it.

Defendant Jackson told Plaintiff she would "look into it."  Doc. 25-1 at 2; Doc. 25-3 at 41.  The parties do not dispute that this is the "only thing" Defendant agreed to do in response to Plaintiff's request.  Doc. 25-1 at 2; Doc. 25-3 at 41.  Nothing on record indicates whether Defendant Jackson took any action regarding the external doors.  Docs. 24, 25-1.  Defendant Jackson allowed Plaintiff to use the phone to call his fiancée, who did not answer, and Plaintiff voluntarily returned to his cell.  Doc. 25-1 at 2; Doc. 25-3 at 86, 95–96.

Four days later, on April 26, 2016, two inmates attacked Plaintiff while Plaintiff was inside his cell with the door locked.  Doc. 23-1 at 5–7; Doc. 25-3 at 29–30, 35–36, 45, 53–60.  Plaintiff noticed the two inmates enter E-1 through the back door, and he realized he did not recognize them.[7]  Doc. 23-1 at 5–6; Doc. 25-3 at 53–54.  He went to his cell and locked himself inside.  Doc. 23-1 at 5–6; Doc. 25-3 at 53–55.  The inmates approached Plaintiff's cell and spoke to him briefly.  Doc. 23-1 at 5–6; Doc. 25-3 at 55–57.  One of the two inmates walked to a window to the control room and asked Officer Rogers, the officer in the control room at the time, to unlock Plaintiff's cell.[8]  Doc. 25-3 at 55–57.

The door to Plaintiff's cell popped open, and the two inmates entered and attacked Plaintiff, who defended himself.  Id. at 56, 58–59.  One inmate pushed Plaintiff to the ground, and Plaintiff "fell and hit [his] head on the side of the toilet."  Id. at 59, 66–69.  Plaintiff lost consciousness around this point, but an inmate in the cell next to him informed Plaintiff that the

---

[7]     Around two days before his attack, Plaintiff noticed a group of unfamiliar inmates unsuccessfully attempt to enter the E-1 dormitory.  Doc. 25-3 at 28–30, 45, 47–50.  On April 26, 2016, he spoke with Officer Wright, a floor officer, and told her that the Bloods put a hit on him.  Id. at 47–40.  Officer Wright told Plaintiff she already knew.  Id.  Plaintiff then requested Officer Wright contact Defendant Jackson so he could speak with her again, and Officer Wright indicated she would.  Id.  However, Plaintiff's attack occurred before he could speak with Defendant Jackson again.  Id.

[8]     The parties do not dispute that Officer Rogers acted improperly in unlocking the door to Plaintiff's cell.  Doc. 23-1 at 6–7; Doc. 25-3 at 55–59.

two inmates then "stomped" on him.  Id.  In total, the attack lasted about two or three minutes.

Id.  Prison officials later identified and disciplined the two inmates responsible for Plaintiff's

attack.  Id.

Plaintiff received medical treatment after his attack, and he spent a day and a half at

Savannah Memorial Hospital.  Id. at 60, 67–70, 97; Doc. 23-1 at 6.  The fight "separate[d his]

shoulder" and caused a "severe concussion."  Doc. 23-1 at 6; Doc. 25-3 at 60, 67–68, 91–94.

Medical staff at the hospital prescribed Plaintiff pain medication, gave him a cortisone shot, "did

MRIs and CAT scans," and told Plaintiff the side effects from his concussion would either go

away in "six months to a year" or last "the rest of [his life]."  Doc. 23-1 at 6; Doc. 25-3 at 60,

67–68, 91–94.  As a result of injuries from the attack, Plaintiff claims he still experiences

occasional dizziness and shoulder pain.  Doc. 25-3 at 70–71, 91–94.  He continues to take

medication, and he has undergone testing for nerve damage.  Id.

Plaintiff filed this action on November 2, 2017.  Doc. 1.  Defendant Jackson filed her

Answer on May 30, 2018.  Doc. 11.  On May 31, 2018, the Court issued a Scheduling Notice

which set discovery to close on October 17, 2018.  Doc. 12.  On August 3, 2018, Plaintiff filed a

motion requesting leave of Court to depose Defendant Jackson and to require Defendant produce

various documents.  Docs. 17, 19.  Defendant responded, contested Plaintiff's need for a

deposition, and certified that on October 1, 2018, Defendant provided Plaintiff with "responses

and objections" to his request for production.  Docs. 20, 21.  Plaintiff requested an extension of

time to submit a reply, which the Court granted.  Docs. 22, 27.  Under this extension, Plaintiff

had until December 17, 2018 to submit his response to Defendant's assertions regarding

Plaintiff's requested discovery.  Doc. 27.  However, Plaintiff failed to submit any argument in

response.  On January 28, 2019, the Court denied Plaintiff's motion.  Doc. 28 at 2–3.  Plaintiff did not file any response or objections to this Order.

On November 11, 2018, Defendant filed a Motion for Summary Judgment.  Under Local Rule 7.5, Plaintiff had 21 days to submit a response in opposition.  Local R. 7.5.  However, Plaintiff failed to do so.  Doc. 29.  On May 9, 2019, the Court "provide[d] Plaintiff with another opportunity to respond to Defendant's motion" and ordered Plaintiff to "file any desired response to Defendant's motion for summary judgment within 21 days" of that Order.  Id.  The Clerk of Court mailed this Order to Plaintiff the same day, and the post office did not return it to the Court as undeliverable or otherwise failing to reach Plaintiff.  However, Plaintiff did not file a response to Defendant's Motion for Summary Judgment.  Thus, Defendant's Motion for Summary Judgment is unopposed.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the moving party demonstrates 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Medicomp, Inc. v. United Healthcare Ins. Co., 562 F. App'x 754, 756 (11th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  Summary judgment is inappropriate, however, when a there is a genuine dispute about a material fact, and a material fact is genuinely disputed when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see Medicomp, 562 F. App'x at 756–57 ("[T]he standard for summary judgment is 'whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.'" (quoting Anderson, 477 U.S. at 252)).

7

The moving party bears the burden of establishing that he is entitled to judgment as a matter of law.  United States v. $688,670.42 Seized from Regions Bank Account No. XXXXXX5028, 449 F. App'x 871, 873 (11th Cir. 2011).  "[T]he movant is entitled to summary judgment where 'the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'"  Medicomp, 562 F. App'x at 756–57 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011); Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007).

Even "when a summary judgment motion is unopposed, the district court must still review the materials submitted in support of the motion and determine whether they establish the absence of a genuine issue of material fact."  Hubbard v. Meritage Homes of Fla., Inc., 520 F. App'x 859, 860 (11th Cir. 2013); Howard v. Gee, 538 F. App'x 884, 891 (11th Cir. 2013); United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004).  When the evidence conflicts, "the court presumes the nonmoving party's evidence to be true and will draw all reasonable inferences in its favor."  Medicomp, 562 F. App'x at 756–57 (citing Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003)).  "However, 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  Id. (citing Celotex, 477 U.S. at 323).

Defendant Jackson moved for summary judgment.  Doc. 23.  Thus, Defendant Jackson bears the burden of establishing that no reasonable juror would find in Plaintiff's favor based on

8

the evidence of record.  If Defendant Jackson can do so, she is entitled to summary judgment as a matter of law.

## DISCUSSION

### I.   Qualified Immunity

Defendant Jackson argues the Court should grant her Motion for Summary Judgment because Plaintiff's claim is barred by qualified immunity.  Doc. 24 at 14–16.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Al-Amin v. Smith, 511 F.3d 1317, 1324 (11th Cir. 2008) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)); Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002); see also Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "[Q]ualified immunity shields from liability 'all but the plainly incompetent or one who is knowingly violating the federal law.'"  Fransen, 857 F.3d at 851 (quoting Lee, 284 F.3d at 1194).

To successfully assert a defense of qualified immunity, Defendant Jackson "must first establish that [she was] acting within [her] discretionary authority during the events in question."  Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003).  If Defendant Jackson does so, "the burden shifts to Plaintiff to show that Defendant Jackson is not entitled to qualified immunity." [9] Id. at 1358.  Plaintiff must show: (1) that "relevant facts . . . set forth a violation of a constitutional right," and (2) that Defendant Jackson "violated a constitutional right that was

---

[9]   Courts may exercise their discretion to choose the order to analyze the "constitutional violation" and "clearly established right" prongs on the qualified immunity analysis.  Williams v. Russo, 636 F. App'x 527, 532 (11th Cir. 2016) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

clearly established at the time of [her] conduct."  <u>Taylor v. Hughes</u>, 920 F.3d 729, 732 (11th Cir. 2019).

Because Defendant Jackson asserts a qualified immunity defense in her Motion for Summary Judgment, Plaintiff must demonstrate that the evidence of record "make[s] out a violation of a constitutional right."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009); <u>Taylor</u>, 920 F.3d at 732; <u>Gilmore v. Hodges</u>, 738 F.3d 266, 272 (11th Cir. 2013); <u>Cottone</u>, 326 F.3d at 1358. "If, under the plaintiff's allegations, the defendants would have violated a constitutional right, 'the next[] . . . step is to ask whether the right was clearly established.'"  <u>Cottone</u>, 326 F.3d at 1358 (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).  Even when there is a genuine factual dispute regarding whether a constitutional violation occurred, if the defendant did not act in violation of clearly established law, then the claim will not proceed past summary judgment. <u>Ansley v. Heinrich</u>, 925 F.2d 1339, 1348 (11th Cir. 1991) ("[I]f the law is not clearly established, the official is entitled to summary judgment regardless of factual disputes." (quoting <u>Harlow</u>, 457 U.S. at 818)).

### A.   Discretionary Authority

Discretionary authority includes all actions of a governmental official that "(1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority."  <u>Dang ex rel. Dang v. Sheriff, Seminole Cty.</u>, 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting <u>Rich v. Dollar</u>, 841 F.2d 1558, 1564 (11th Cir. 1988)); <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1120 (11th Cir. 2013).  Defendant Jackson worked as a Unit Manager at Georgia State Prison, and her duties included security management.  Doc. 25-1 at 3.  The facts of record show Defendant Jackson acted within the scope of her discretionary authority in meeting with Plaintiff and deciding how to respond to his concerns.

**B.     Constitutional Violation**

Because Defendant Jackson acted within the scope of her discretionary authority, the burden shifts to Plaintiff to show that qualified immunity does not apply.  <u>Dang</u>, 871 F.3d at 1279 (<u>quoting</u> <u>Lee</u>, 284 F.3d at 1194); <u>Cottone</u>, 326 F.3d at 1357.  Plaintiff must "prove that the facts alleged, construed in the light most favorable to [him], establish that a constitutional violation did occur."  <u>Shaw v. City of Selma</u>, 884 F.3d 1093, 1099 (11th Cir. 2018) (citing <u>Smith v. LePage</u>, 834 F.3d 1285, 1291 (11th Cir. 2016)); <u>Gilmore v. Hodges</u>, 738 F.3d 266, 272 (11th Cir. 2013); <u>see also</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001).

Here, Plaintiff alleges Defendant Jackson violated his Eighth Amendment rights. Defendant Jackson argues the evidence of record does not support a reasonable inference that she infringed on Plaintiff's constitutional rights.  Thus, the question before the Court is whether a genuine dispute of material fact exists on each essential element of Plaintiff's Eighth Amendment claim.  Even if this inquiry resolves in Plaintiff's favor, qualified immunity will shield Defendant Jackson from liability unless she also acted in violation of clearly established law.  With this in mind, the Court first examines whether Defendant Jackson meets her burden of showing the evidence of record is insufficient, as a matter of law, to create an Eighth Amendment violation.

**1.     *Eighth Amendment Failure-to-Protect Claim Legal Requirements***

Plaintiff alleges Defendant Jackson violated the Eighth Amendment by failing to protect him from an attack by other inmates even though she knew he faced a substantial risk of serious harm.  The Eighth Amendment forbids the infliction of cruel and unusual punishment.  U.S. Const. amend. VIII; <u>Terry v. Bailey</u>, 376 F. App'x 894, 895 (11th Cir. 2010).  The Eighth Amendment "imposes a duty on prison officials" to "take reasonable measures to guarantee the

safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099–1100 (11th Cir. 2014). "Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313, 1319 (11th Cir. 2005) (citing Farmer v. Brennan, 511 U.S. 825 (1994)). However, prison officials are not automatically liable for "every injury suffered by one prisoner at the hands of another . . . ." Bowen v. Warden, Baldwin State Prison, 826 F.3d 1312, 1320 (11th Cir. 2016) (citing Farmer, 511 U.S. at 834); Purcell, 400 F.3d at 1319.

"To survive summary judgment on a deliberate indifference failure-to-protect claim, 'a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" Caldwell, 748 F.3d at 1099 (quoting Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013)); see also Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (quoting Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995)).

*(a)      Substantial Risk of Serious Harm*

To bring an Eighth Amendment claim, a plaintiff must show that, viewed objectively, he actually faced a substantial risk of serious harm. Caldwell, 748 F.3d at 1099. This requires showing that the risk presented was *substantial*, not just speculative, theoretical, or insignificant. Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010); Estate of Owens v. GEO Grp. Inc., 660 F. App'x 763, 767 (11th Cir. 2016) ("[T]he risk must be actual, rather than potential or speculative." (citing Carter, 352 F.3d at 1349–50)). Secondly, this objective element calls for a showing that the risk created the  possibility of not just harm or injury but a *serious* harm or injury. See Hunt v. Warden, 748 F. App'x 894, 900 (11th Cir. 2018) ("[M]ere discomfort, without more, does not offend the Eighth Amendment.").

"[A] prisoner's exposure to the potential for a fight does not, in and of itself, constitute substantial risk of harm."  Estate of Owens, 660 F. App'x at 767 (citing Purcell, 400 F.3d at 1323).  A substantial risk of serious harm exists when the "risk of inmate-on-inmate violence at a jail" is "excessive."  Purcell, 400 F.3d at 1320.  The threat of violence must be "extreme" enough to create "an unreasonable risk of serious damage to the prisoner's health or safety."  Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010); see also Estate of Owens, 660 F. App'x at 767.

(b)     Deliberate Indifference to Risk

If a substantial risk of serious harm exists, the inquiry turns to the second element, which is sometimes referred to as the "deliberate indifference" element of the overall Eighth Amendment claim.  Rodriguez, 508 F.3d at 617; Caldwell, 748 F.3d 1099.  "The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective."  Caldwell, 748 F.3d at 1099; see Bowen, 826 F.3d at 1320–21.  A prison official acts with deliberate indifference "when he actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner."  Rodriguez, 508 F.3d at 617.

**Subjective Component.**  "[T]he subjective component" of the second element deals with "the defendant's actual knowledge that an inmate faced a substantial risk of serious harm . . . ."  Caldwell, 748 F.3d at 1099; see Smith v. Reg'l Dir. of Fla. Dep't of Corr., 368 F. App'x 9, 14 (11th Cir. 2010).  "[T]he defendant 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Caldwell, 748 F.3d at 1099–100 (quoting Farmer, 511 U.S. at 837); see Bowen, 826 F.3d at 1320–21; Smith, 368 F. App'x at 14.  "[T]he known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate

indifference." <u>Doe v. Georgia Dep't of Corr.</u>, 245 F. App'x 899, 903 (11th Cir. 2007) (quoting <u>Brown</u>, 894 F.2d at 1537).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." <u>Bowen</u>, 826 F.3d at 1321 (citing <u>Farmer</u>, 511 U.S. at 842). The "degree of specificity" of the facts subjectively known to the defendant is a relevant consideration in determining whether the defendant knew the risk was serious and the harm substantial. <u>Id.</u> at 1322; <u>Caldwell</u>, 748 F.3d at 1102 (emphasis in original). However, "[t]he trier of fact may . . . 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" <u>Bowen</u>, 826 F.3d at 1321 (citing <u>Farmer</u>, 511 U.S. at 842).

***Objective Component.*** The objective component of the second element requires an evidentiary showing that the defendant disregarded the risk by "failing to respond to it in an (objectively) reasonable manner.'" <u>Caldwell</u>, 748 F.3d at 1099 (quoting <u>Rodriguez</u>, 508 F.3d at 616. "An official responds to a known risk in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'" <u>Rodriguez</u>, 508 F.3d at 619–20 (quoting <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1583 (11th Cir. 1995)). Importantly, however, to be deliberately indifferent, a prison official's unreasonable response to the risk of serious harm must demonstrate more than mere negligence. <u>Smith</u>, 368 F. App'x at 14 ("[S]imple negligence is not actionable under § 1983, and a plaintiff must allege a conscious or callous indifference to a prisoner's rights." (quoting <u>Williams v. Bennett</u>, 689 F.2d 1370, 1380 (11th Cir. 1982))); <u>see also</u> <u>Moulds v. Bullard</u>, 345 F. App'x 387, 391 (11th Cir. 2009) ("[M]erely negligent failure to protect an inmate from attack does not justify liability under section 1983." (quoting <u>Carter v.</u>

Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003))); Purcell, 400 F.3d at 1321 ("[A] 'prison custodian is not the guarantor of a prisoner's safety.'" (quoting Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990))).

*(c)   Causation*

"As with any other claim brought under § 1983, to succeed, the inmate must demonstrate a causal connection between the prison official's conduct and the Eighth Amendment violation." Rodriguez, 508 F.3d at 617.  This requires "evidence of causation between [prison official's] deliberate indifference and [the plaintiff's] injury."  Hale v. Tallapoosa County, 50 F.3d 1579, 1584 (11th Cir. 1995); see also Rodriguez, 508 F.3d at 622.  Specifically, Plaintiff is "required to show two causal links: first, a link between [Defendant's] allegedly deliberately indifferent acts and omissions and the excessive risk of violence; and second, a link between the excessive risk of violence and his injury."  Hale, 50 F.3d at 1584.

**2.   Application to Plaintiff's Claim**

*(a)   Substantial Risk of Serious Injury*

The facts of record are enough that a reasonable juror could infer that Plaintiff faced a substantial risk of serious harm.  First, the hit Blood gang members put on Plaintiff could create an objective risk of serious harm to Plaintiff.  During his deposition, Plaintiff testified that the Bloods had a hit out on him.  Doc. 25-3 at 37, 95–97.  He also explained that a "hit" could involve anything from being jumped, stabbed, or killed, depending on what the "person that's taken the hit up" decides to do.  Id. at 30–31, 35–36, 96–97.  Based on the evidence of record, it would not be unreasonable to conclude that the hit created a threat of an attack which could cause serious damage to Plaintiff's health and safety.

This evidence also supports an inference that the hit created a substantial risk that Plaintiff would be physically attacked.  The parties do not dispute that Blood gang members were present at Georgia State Prison or that affiliated inmates could access the E-1 dormitory.[10] Doc. 23-1 at 3.  Those gang members—or inmates associated with them—attempted to gain access to Plaintiff at least two different times while Plaintiff was in the E-1 dormitory before Plaintiff's attack.  Doc. 25-3 at 27, 35–36, 45–48, 53–54.  Indeed, Plaintiff testified that he observed unknown inmates attempting to enter the E-1 dormitory to attack him before his conversation with Defendant Jackson.[11]  Id.  Taken as true, a reasonable juror could find this evidence shows Plaintiff faced a concrete and substantial (as opposed to a theoretical or speculative) risk of a violent, physical attack by members of the Bloods.

Defendant Jackson asserts that the risk of harm could not be objectively serious because she offered to place Plaintiff in Tier I "for his safety," but he "chose not to go to lockdown and segregation."  Doc. 24 at 9.  But the parties dispute whether this occurred.  Defendant Jackson asserts that she told Plaintiff "that if Plaintiff felt he needed to be secluded, he can go back to Tier I, also referred to as 'lockup' or 'segregation.'"  Doc. 23-1 at 3.  According to Defendant, "[i]n response to Defendant's offer for Plaintiff to be returned to Tier I lockup for his safety, Plaintiff stated he did not want to go to lockup because his fiancée is supposed to be coming down from Pennsylvania and he did not want to be in lock up when she comes."  Id.; Doc. 25-2; Doc. 25-3 at 118–19.  Defendant Jackson recorded this information in a case note, which she

---

[10]    Defendant argues Plaintiff did not "provide the names of any particular inmates from whom he sought protection."  Doc. 24 at 9.  While the concreteness and level of specificity of the alleged threat against Plaintiff is relevant to determine the likelihood of the risk he faced, the threat against Plaintiff is not so vague and undefined as to foreclose the reasonable inference that the hit created a substantial degree of probability that Plaintiff would be attacked.

[11]    In his Complaint, he alleges that the Bloods "had a $1000 hit" on him and "kept running into E-1 dorm trying to get [him]."  Doc. 1 at 5.

entered in the prison database the same day she met with Plaintiff.  Doc. 25-2; Doc. 25-3 at 118–19.

At his deposition, Plaintiff stated that Defendant Jackson "didn't offer [him] regular Tier I."  Doc. 25-3 at 34.  Rather, he testified that Defendant Jackson "never asked [him] if [he] wanted to go back to Tier I" and "never mentioned going to regular lockdown or nothing."  Id. at 30, 34, 85.  If Defendant offered to transfer Plaintiff to Tier I and Plaintiff refused, this fact would cut against a conclusion that Plaintiff faced a substantial risk.  But where it is disputed, a reasonable juror could choose to credit Plaintiff's allegation that Defendant Jackson did not offer to transfer him to Tier I.  Given the dispute about this fact, the Court gives no weight to whether Plaintiff might have voluntarily turned down transfer to Tier I in considering whether he was facing a substantial risk of serious harm.

Next, Defendant Jackson argues Plaintiff did not face a substantial risk of serious harm because Plaintiff could avoid an attack by other inmates by returning to his cell and locking it.  Doc. 24 at 8–9.  Plaintiff successfully circumvented two prior attempted attacks by locking himself inside his cell after noticing unfamiliar inmates enter the E-1 dormitory.  While Plaintiff's ability to retreat and lock his cell provides some degree of protection, it does not automatically or necessarily reduce the threat against him to a constitutionally permissible level.

First, the fact that Plaintiff approached Defendant Jackson and asked for additional protection while he was housed in the E-1 dormitory presents some evidence supporting the conclusion that this unique self-locking mechanism, by itself, was insufficient to reduce the risk.  The evidence also, arguably, shows that Plaintiff faced a substantial risk of serious harm while in common areas of the dormitory and, potentially, in other parts of the prison.  Defendant Jackson does not demonstrate that Plaintiff could have avoided an attack entirely simply by refusing to

ever exit his cell.  Furthermore, nothing indicates Plaintiff could receive all necessary services (such as food and showers) while inside his cell.  Even if Plaintiff's choice to spend time outside his cell was entirely voluntary, he testified that he did not remain locked inside his cell but rather intentionally remained close to his cell in order to protect himself.  Doc. 25-3 at 52.

To be sure, a reasonable juror might conclude that Plaintiff's decision to exit his cell *at all* shows that Plaintiff did not face a real risk of attack and, thus, objectively, the risk was not substantial.  This, however, shows only that the evidence could support more than one conclusion.  The threat, viewed objectively, is not diminished enough to fall out of the scope of Eighth Amendment protection simply because Plaintiff possessed some means of avoiding it while in one part of the prison.  Thus, a reasonable juror could find a substantial risk of serious harm based on the evidence of record.

### (b)     *Defendant's Deliberate Indifference to the Risk*

Plaintiff must also demonstrate that Defendant Jackson was both aware of the substantial risk of serious harm (the subjective component) and that she did not respond reasonably to that risk (the objective component).  See Rodriguez, 508 F.3d at 619–20 ("[A] prison official violates the Eighth Amendment if he responds to a known risk 'in an objectively unreasonable manner.'" (quoting Cottone, 326 F.3d at 1358)); Doe, 245 F. App'x at 902 ("Failure to protect from an objectively significant risk that should have been—but was not—perceived, is no infliction of punishment under the Eighth Amendment.").  Here, a genuine factual dispute exists as to both components of the deliberate indifference element.

***Subjective Component.***  Defendant Jackson states in her affidavit that Plaintiff "did not indicate" and she "did not understand" that Plaintiff believed he "was under a substantial risk of serious harm from other inmates" because other inmates "could not properly gain access to

[Plaintiff]" when Plaintiff was in his cell with the door locked.  Doc. 25-1 at 3.  Although a defendant's own statement that she lacked subjective understanding is part of the inquiry, the deliberate indifference element cannot be resolved based solely on a defendant's allegations regarding her beliefs—otherwise, a defendant could successfully defeat any Eighth Amendment claim by simply denying all subjective knowledge.  Thus, the question is not only focused on what Defendant Jackson asserts she believed but rather on whether a reasonable juror could "infer from the evidence" that Defendant Jackson "actually knew of a *substantial risk* [that other inmates] would *seriously harm* [Plaintiff]."  Caldwell, 748 F.3d at 1102 (citing Farmer, 511 U.S. at 842)); see Chatham v. Adcock, 334 F. App'x 281, 294 (11th Cir. 2009) (dismissing a failure to protect claim when there was "insufficient evidence in the record to allow the Court, or a jury, to second guess [the defendant's] assertion that she was not aware of a substantial risk of serious harm to Plaintiff").

A reasonable juror could conclude that Defendant Jackson was subjectively aware of specific facts through which she could infer that Plaintiff faced a substantial risk of serious injury.  At his deposition, Plaintiff testified that Defendant Jackson "knew everything [he] did" and that he "told her everything."  Doc. 25-3 at 94–96.  It would not be unreasonable to interpret this statement to mean exactly what it says—that Plaintiff told Defendant Jackson everything he knew about the threat, and thus, Defendant Jackson possessed the same subjective awareness as Plaintiff.

Even assuming a reasonable juror would not assign this meaning to Plaintiff's testimony, it is undisputed that Defendant Jackson, before allegedly failing to take action, knew:
(1) Plaintiff could lock his assigned cell by himself from the inside, doc. 23-1–2, doc. 25-1 at 2;
(2) the exterior doors to the E-1 dormitory could be locked, doc. 23-1–2, doc. 25-1 at 2;

(3) unnamed gang members (specifically, Bloods) "had a hit on" Plaintiff, doc. 23-1 at 2;

(4) Plaintiff feared for his safety due to this hit, doc. 25-3 at 30, 35–36, 95–96; (5) inmates

housed elsewhere were entering the E-1 dormitory to find Plaintiff and how they were entering,

doc. 25-3 at 95–96; (6) Plaintiff requested the external doors be locked, doc. 25-3 at 29, 41, 96;

and (7) Plaintiff requested he "to be moved to the other side" of the prison or "placed in

protective custody," doc. 21-1 at 3, doc. 25-3 at 95–96.

These facts do not show a generalized, vague, or unsubstantiated threat.  Rather, the

information known to Defendant Jackson is specific enough to support a reasonable

determination that she knew Plaintiff faced a "strong likelihood, rather than a mere possibility"

of injury.[12] Bowen, 826 F.3d at 1321; Caldwell, 748 F.3d at 1102; Rodriguez, 508 F.3d at 621

(finding a defendant subjectively knew of a substantial risk of serious harm because the

defendant knew that members of a specific gang subsequently threatened to kill plaintiff after

plaintiff renounced his membership, that the specific gang existed at the prison, and that plaintiff

requested to be placed in protective custody).

Additionally, a reasonable juror could infer, based on Plaintiff's request for removal and

reassignment, that Defendant Jackson was aware Plaintiff did not believe the self-locking

mechanism provided sufficient protection.  McBride v. Rivers, 170 F. App'x 648, 654 (11th Cir.

2006) ("In determining subjective knowledge, a court is to inquire whether the defendant was

aware of a 'particularized threat or fear felt by [the plaintiff].'" (quoting Carter, 352 F.3d at

1350)); see also Caldwell, 748 F.3d at 1101 (reversing the grant of summary judgment to

---

[12]     As discussed above, because the parties dispute whether Defendant Jackson offered to recommend Plaintiff for placement in Tier I, Defendant's claim that Plaintiff rejected this offer is given no weight in this analysis.  Doc. 24 at 11 ("Given the safety of Plaintiff's properly locked cell and Plaintiff's decision not to go to segregation if he felt it necessary for his safety and protection, no inference can be drawn that Defendant knew of a substantial risk of harm to Plaintiff . . . .").

defendants when "a jury could reasonably infer from the facts preceding [the plaintiff's] expression of fear [of attack by another inmate] that [plaintiff] had a well-founded basis for his fear").

To the extent that Defendant Jackson argues that she lacked subjective awareness of the harm posed to Plaintiff because Plaintiff failed to share specific details of the threat against him with her, these arguments fail.  Though Plaintiff never provided Defendant Jackson with the names of the specific inmates who posed a danger to him, his allegation that members of the Bloods gang offered inmates $1000 to attack Plaintiff is not insufficient as a matter of law simply because Plaintiff did not name the specific inmates who eventually attacked him.  Doc. 1 at 5; Doc. 25-3 at 29–30, 33–36, 53–54, 95–96; Doc. 24 at 9, 17; Rodriguez, 508 F.3d at 617 ("A prison official cannot avoid liability under the Eighth Amendment 'by showing that . . . he did not know the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.'" (emphasis omitted) (quoting Farmer, 511 U.S. at 843)); Hale, 50 F.3d at 1583 (finding inmates are "not required to show [defendants] knew 'precisely who would attack whom,' but only that" [defendants] had subjective knowledge" of a substantial risk of serious harm (citations omitted)).  In sum, the facts demonstrate that a jury conclude that Defendant was subjectively aware that Plaintiff face a substantial risk of serious harm.

***Objective Component***.  A genuine dispute of material fact also exists as to whether Defendant Jackson's response to the April 22, 2016 meeting with Plaintiff was objectively unreasonable.  Defendant argues Plaintiff did not to show evidence that she "failed to take reasonable measures to guarantee Plaintiff's safety and protect Plaintiff from other inmates." Doc. 24 at 7–9, 11–12.  Ostensibly, Plaintiff's argument is that Defendant Jackson failed to respond to this meeting in a reasonable manner because: (1) she did not recommend he be

reassigned to either protective custody (the K-4 dorm) or to the other side of the prison (the C-Building); and (2) because she did not notify other prison officials about the need to keep the doors to the E-1 dorm closed.  Doc. 25-3 at 76.

      The parties do not dispute that Plaintiff asked Defendant Jackson to move him to either K-4 or the C-Building on the other side of the prison or that Defendant Jackson did not recommend any change to Plaintiff's assigned housing after her meeting with Plaintiff. Additionally, the parties agree that Defendant Jackson agreed to look into whether the external doors which separated the E-1 dormitory from other areas of the prison could be locked.  Finally, the parties do not disagree that, after Defendant Jackson stated she could not move Plaintiff to either the K-4 dormitory or the C-Building and agreed to look into having officers lock the external doors for E-1, Plaintiff voluntarily returned to cell E1-14.  Doc. 25-2; Doc. 25-3 at 29, 76.  The evidence before the Court shows that after meeting with Plaintiff, Defendant Jackson entered her notes on that meeting into the prison's management system.  Doc. 25-1 at 3; Doc. 25-3 at 3.  While Defendant Jackson told Plaintiff she would "look into keeping the exterior doors to the dormitory locked," nothing indicates Defendant Jackson took any steps to follow up on this request after her meeting with Plaintiff.  Doc. 25-1 at 2; Doc. 25-3 at 3, 12, 16–17.

      Defendant Jackson asserts that she told Plaintiff the K-4 dormitory was full and that she could not move him to the opposite side of the prison because of Plaintiff's security classification.  Doc. 25-1 at 2.  Plaintiff does not dispute that K-4 protective custody was at capacity, but Plaintiff testified at his deposition that Defendant Jackson "could have moved [him]" to the other side of the prison despite his security classification because "there [are] other inmates on the other side of the prison with close security."  Doc. 25-3 at 33.  This factual dispute is immaterial, however, because the question is not whether Defendant Jackson acted

reasonably in refusing to transfer Plaintiff to the locations he requested, but rather whether, objectively, Defendant Jackson acted reasonably in taking no steps to ensure Plaintiff's safety from attacks by gang members who had taken a hit out on him.  A reasonable juror could conclude that leaving Plaintiff in the E-Building was insufficient to provide a reasonable protection from violence, even in light of Plaintiff's ability to lock himself in his cell.

While Plaintiff agrees he "could have" requested Defendant Jackson place him on Tier I and that he could have "refused housing" and been placed in a more restrictive setting, it is not incumbent on prisoners to suggest every possible safe alternative to prison staff.  Doc. 25-3 at 48, 63–64.  "[T]he Supreme Court has made clear that 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'"  Bowen, 826 F.3d at 1320 (quoting Farmer, 511 U.S. at 833); Caldwell, 748 F.3d at 1099.  Prisoners, by nature of their incarceration, must rely on prison officials to protect them from serious harm from other inmates.  Farmer, 511 U.S. at 833–34 ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." (quotation omitted)); Caldwell, 748 F.3d at 1099.  No authority suggests that this duty to protect, when triggered, would be limited to an analysis of the safety options suggested by the prisoner.  See Farmer, 511 U.S. at 833–34; Bowen, 826 F.3d at 1320 ("[I]t is well settled that a prison inmate has a constitutional right to be protected . . . from physical assault by other inmates." (quoting Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986)).  Moreover, prison officials cannot simply provide an inmate with a self-locking cell and then "let the state of nature take its course."  Farmer, 511 U.S. at 833–34.

Defendant argues she "did not ignore or disregard a known risk" because she considered Plaintiff's request for a housing reassignment, determined Plaintiff could not be moved to the areas he requested, and "indicat[ed] that she would check into having officers keep the back door

to the building closed . . . ." Doc. 24 at 12.  But the evidence does not demonstrate that Defendant Jackson took any subsequent action regarding the information she learned during her meeting with Plaintiff.  Defendant Jackson never alleges she did, in fact, look into Plaintiff's request regarding the external doors.  See Doc. 25-1.  A reasonable juror could conclude that Defendant Jackson knowingly or recklessly declined to take any action (other than uploading notes into a database) after learning of the risk of harm to Plaintiff and that she acted unreasonably in failing to take any steps to reduce the risk.  Alternatively, a reasonable juror could conclude that Defendant Jackson did, in fact, offer to recommend Plaintiff for placement in Tier I and that Defendant Jackson acted reasonably in taking no action after Plaintiff declined this request.  Thus, a genuine dispute of material fact exists as to this element.

(c)     Causation

Finally, in order to prove his claim, Plaintiff must demonstrate that Defendant Jackson's inaction caused his injury.  Plaintiff asserts that, if Defendant Jackson "would have moved [him] or stuck [him] in K-4, [he] wouldn't have got jumped."  Doc. 25-3 at 33.  Defendant Jackson asserts she did not possess the authority to do anything more than recommend Plaintiff's transfer to another cell block and, thus, her refusal to transfer Plaintiff did not cause his injury.  Doc. 24 at 12–14.

The Eleventh Circuit has found that, "[f]or purposes of determining whether [a prison official] caused the Eighth Amendment violation and [the plaintiff's] subsequent injury, the 'critical' question is whether [that prison official] was "in a position to take steps that could have averted the [injury] but, through deliberate indifference, failed to do so."  Rodriguez, 508 F.3d at 622 (quoting Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982)).  Rather, "a plaintiff demonstrates the 'necessary causal link' in this context where he is able to show that the prison

official (1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence,' and (3) had 'other means[] available to him which he nevertheless disregarded.'" Id. (quoting LaMarca v. Turner, 995 F.2d 1526, 1539 (11th Cir. 1993)).

The parties dispute whether Defendant Jackson had the final authority to reassign Plaintiff to another dormitory at Georgia State Prison.  Doc. 25-1 at 3; Doc. 25-3 at 32–35, 50.  Defendant Jackson, however, admits she had "authority to recommend to the Classification Committee that it consider an inmate for reassigned housing and inmate an administrative process."  Doc. 25-1 at 3.  Thus, at the very least, a material factual dispute exists as to whether Defendant Jackson could substantially improve Plaintiff's safety.  The same facts which support an inference of deliberate indifference on Defendant Jackson's part would support a showing that she knew failing to take any action would not reasonably protect Plaintiff.  Finally, because there is no evidence that Defendant Jackson followed up on Plaintiff's request regarding the external doors in the E-1 dormitory, it is reasonable to conclude she had other methods available to her to better ensure Plaintiff's safety, but she disregarded those methods.

Additionally, Defendant argues that Officer Rogers, in improperly unlocking Plaintiff's cell, "sever[ed] any causal connection" between Defendant Jackson's conduct and Plaintiff's injury.  Doc. 24 at 13.  However, Plaintiff alleges that had Defendant Jackson taken steps to ensure his safety, he would not have remained in the E-1 dormitory where he was vulnerable to an attack.  And, if Defendant Jackson had followed up on the unsecured door issue, the inmates who attacked Plaintiff may have been precluded from ever entering the E-1 dormitory.  Thus, a factual dispute exists as to causation.  A reasonable jury could find, based on this evidence, that Defendant Jackson's actions or lack of actions caused Defendant's injuries.

In sum, because there are genuine disputes of material facts as to each of element of

Plaintiff's claim, the Court cannot conclude, as a matter of law, that Defendant Jackson did not

violation Plaintiff's Eighth Amendment rights.  On this basis alone, Defendant Jackson would

not be entitled to summary judgment.

### C.      Clearly Established Law

Even though genuine factual disputes exist as to whether Defendant Jackson violated

Plaintiff's Eighth Amendment rights, because Defendant Jackson has invoked qualified

immunity as a defense, Plaintiff must demonstrate that Defendant Jackson's alleged actions—if

proven to be true—constituted a violation of "clearly established law" in April 2016, the time of

the possible violation.

"In determining whether a right is clearly established, the relevant, dispositive inquiry is

'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted.'"  Caldwell, 748 F.3d at 1102 (quoting Cottone, 326 F.3d at 1359); see also

Saucier, 533 U.S. at 202; Wilson v. Layne, 526 U.S. 603, 615 (1999).  "A right can be clearly

established 'either by similar prior precedent, or in rare cases of obvious clarity.'"  Brooks v.

Warden, 800 F.3d 1295, 1306 (11th Cir. 2015) (quoting Gilmore v. Hodges, 738 F.3d 266, 277

(11th Cir. 2013)).  To determine "whether the law clearly established the relevant conduct as a

constitutional violation at the time that [d]efendant [o]fficers engaged in the challenged acts," the

defendants must have had "fair warning" that their conduct violated a constitutional right.

Fransen, 857 F.3d at 851 (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011)).

"'Fair warning' comes in the form of binding caselaw from the Supreme Court, the

Eleventh Circuit, or the highest court of the state . . . that 'makes it obvious to all reasonable

government actors, in the defendant's place, that what he is doing violates a federal law.'"  Id.

(quoting Priester, 208 F.3d at 926); Bowen, 826 F.3d at 1325.  While a plaintiff need not supply "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  White v. Pauly, 137 S. Ct. 548, 551 (2017); Harris v. Coweta County, 21 F.3d 388, 393 (1994) ("The 'very action in question' does not have to have been previously held unlawful, but the unlawfulness of the conduct must be apparent in light of pre-existing law." (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987))).  Notably, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The Eleventh Circuit has "clarified that a prison guard violates a prisoner's Eighth Amendment right when that guard actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm."  Caldwell, 748 F.3d at 1102.  However, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  Alexander v. Univ. of N. Fla., 39 F.3d 290, 291 (11th Cir. 1994) (quotation omitted).

Unique facts exist here which distinguish this case from other Eleventh Circuit holdings regarding Eighth Amendment failure-to-protect claims.  Unlike most prisoners who fear an attack from another inmate, Plaintiff was not "stripped . . . of virtually every means of self-protection" because Plaintiff could lock himself inside of his single-man cell.  See Farmer, 511 U.S. at 833.  The unique self-locking mechanism and the nature of the threat posed by the gang hit are significant facts not found in other Eleventh Circuit decisions denying qualified immunity

27

in failure to protect claims brought by prisoners.  See Bowen, 826 F.3d at 1325; Caldwell, 748 F.3d at 1102; Cottone, 326 F.3d at 1358–59.  The existing law in April 2016 would not have placed Defendant Jackson on notice that she faced liability for failing to respond to an inmate's allegations of a threatened hit from another gang.  Woodyard v. Ala. Dep't of Corr., 700 F. App'x 927, 933 (11th Cir. 2017); Rodriguez, 508 F.3d at 616.  Rather, binding precedent has not yet "clarifie[d] the circumstances in which threats between inmates *are* sufficient" to show a prison official's "refusal to act on a threat" violates clearly established law.  Woodyard, 700 F. App'x at 933; Rodriguez, 508 F.3d at 616 n.11 (declining to examine qualified immunity when defendants did not assert the defense in a case related to a prison official's failure to protect a former gang member from threats to his life made by members of his old gang).

Plaintiff fails to point to any indistinguishable or similar Eleventh Circuit case law which clearly establishes that a prison official violates the Eighth Amendment when that prison official is informed an inmate assigned to a self-locking cell is the target of an alleged gang hit and that prison official does not take additional steps to protect that inmate.  Moreover, nothing indicates that this is a case where the constitutional violation is encompassed in a "broad statement of principle" made so obviously clear by case law that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  Terrell v. Smith, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting Vinyard, 311 F.3d at 1351).  Finally, the facts here are not so egregious as to fall within the narrow exception which lifts the qualified immunity bar even in the absence of any case law.

Because Defendant Jackson did not violate clearly established law, she is entitled to summary judgment on the issue of qualified immunity.  I, therefore, **RECOMMEND** the Court **GRANT** Defendant's Motion for Summary Judgment.

II.     **Leave to Appeal** *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*.  Though Plaintiff

has not yet filed a notice of appeal, it would be appropriate to address these issues in the Court's

order of dismissal.  Fed. R. App. P. 24(a)(3) (trial court may certify that appeal is not taken in

good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is

not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this

context must be judged by an objective standard.  Busch v. County of Volusia, 189 F.R.D. 687,

691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a

frivolous claim or argument.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A claim

or argument is frivolous when it appears the factual allegations are clearly baseless or the legal

theories are indisputably meritless.  Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v.

Gross, 984 F.2d 392, 393 (11th Cir. 1993).  An *in forma pauperis* action is frivolous and not

brought in good faith if it is "without arguable merit either in law or fact."  Napier, 314 F.3d at

531; see also Brown v. United States, Nos. 4:07-cv-085, 4:03-cr-001, 2009 WL 307872, at *1–2

(S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's action, there are no non-frivolous issues to

raise on appeal, and an appeal would not be taken in good faith.  Thus, the Court should **DENY**

Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

For the reasons set forth above, I **RECOMMEND** the Court **GRANT** Defendant

Jackson's unopposed Motion for Summary Judgment, doc. 23, **DISMISS** Plaintiff's Complaint,

and **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of

dismissal.  Additionally, I **RECOMMEND** the Court **DENY** Plaintiff *in forma pauperis* status on appeal.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within 14 days of the date on which this Report and Recommendation is entered.  Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included.  Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge.  See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985).  A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not meeting the specificity requirement set out above will not be considered by a District Judge.  A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

The Court **DIRECTS** the Clerk of Court to serve this Report and Recommendation upon Plaintiff at his last known address and Defendant.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 14th day of August, 2019.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA